MEEHAN, J.
*565 *748 Timothy Craine was convicted by jury of indecent exposure. It was his sixth such conviction, thus making the offense a felony. He was sentenced to seven years in prison.
Craine represented himself at trial. On appeal, he contends the trial court breached a sua sponte duty to determine his mental competence under Penal Code section 1368 (all further statutory references are to this code). In a related claim, he argues the trial court should have assessed his competence to proceed in propria persona under a "heightened standard" as compared to the one used to determine a defendant's competence to stand trial. He further alleges sentencing error based on the trial court's failure to state its reasons for imposing the maximum prison term.
In supplemental briefing, Craine argues for retroactive application of section 1001.36, which authorizes "pretrial diversion" in certain cases involving mentally disordered offenders. In the published portion of our opinion, we conclude the Legislature did not intend for section 1001.36 to apply retroactively to defendants whose cases have already progressed beyond the stage of trial, adjudication of guilt, and sentencing. The judgment will be affirmed.
FACTUAL AND PROCEDURAL BACKGROUND
In early 2016, Craine was residing in a special housing unit at the North Kern State Prison. He had recently been classified as a mentally disordered offender (MDO) (see § 2960 et seq.) and placed on a "suicide watch," which entailed continuous monitoring by a certified nursing assistant (CNA). On or about January 13, 2016, Craine stripped naked in front of a female CNA and began masturbating. A second CNA witnessed this behavior, as did a correctional officer who intervened.
Craine was subsequently transferred to a Department of State Hospitals facility in Atascadero. He was later charged with one count of felonious indecent exposure (§ 314, subd. (1)). For enhancement purposes, he was alleged to have served five prior prison terms (§ 667.5, subd. (b)).
The record does not identify the nature of Craine's mental disorder, but he remained in Atascadero until being transferred to the Kern County Jail in connection with this case. On April 7, 2016, Craine appeared at a preliminary hearing with appointed counsel. Eleven days later, he was represented by appointed counsel during another court proceeding. In June 2016, shortly before trial, Craine successfully moved to represent himself pursuant to Faretta v. California (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 ( Faretta ).
*749 He acknowledged his constitutional rights and unequivocally waived the right to counsel, both orally and in writing.[1]
A three-day trial commenced on June 15, 2016. Craine presented arguments on motions in limine, participated in the jury selection process, gave opening and closing statements, and cross-examined two of the three witnesses who testified. He disputed a prior prison term allegation concerning a conviction for second degree burglary, and one such allegation was dismissed at the People's request.
*566 The jury returned a guilty verdict and found the enhancement allegations to be true. The trial court imposed the upper term of three years and added four consecutive one-year enhancements for the prison priors. A handwritten notice of appeal, which was served upon the district attorney's office and belatedly received by the trial court, was deemed to have been timely filed.
DISCUSSION
I.-III.**
IV. Section 1001.36 Does Not Apply Retroactively To Convicted Defendants
Section 1001.36 was enacted during the pendency of this appeal. It authorizes, in lieu of criminal prosecution, the placement of certain alleged offenders into mental health treatment programs. The statute expressly contemplates a "pretrial diversion" procedure (id. , subd. (a)), but Craine contends he is still a "potential candidate for diversion," assuming the law applies retroactively. The issue of retroactivity is currently under review by the California Supreme Court. (See People v. Frahs (2018) 27 Cal.App.5th 784, 238 Cal.Rptr.3d 483, review granted Dec. 27, 2018, S252220 ( Frahs ).)
We conclude the text of section 1001.36 and its legislative history contraindicate a retroactive intent with regard to defendants, like Craine, who have already been found guilty of the crimes for which they were charged. The statute potentially mitigates punishment for a specific class of persons, i.e., mentally disordered alleged offenders whose charges have not yet been adjudicated (id. , subds. (a), (c)), and Craine is not a member of the class. The primary legislative goal of diverting mentally ill defendants from the criminal *750 justice system through preadjudicative intervention programs cannot be achieved once the defendant has been tried, adjudged guilty, and sentenced.
Secondary goals of judicial economy and fiscal savings would actually be thwarted by attempting to apply the statute to defendants who have begun serving their sentences. In many instances, such individuals will have been released from confinement by the time their cases are remanded to determine their fitness for any supposed diversionary relief. Furthermore, although section 1001.36 provides for the dismissal of charges and expungement of a defendant's record of arrest, there is no mention of similar relief for a record of conviction. As we will discuss, there are distinctions between a preconviction and postconviction dismissal of charges, and the Legislature's failure to address those differences also weighs against any inference of retroactive intent.
A. Statutory Overview
California has an expanding number of diversion programs, "which generally authorize trial courts to divert eligible persons charged with qualifying offenses from the normal criminal process into treatment and rehabilitation." ( Wade v. Superior Court (2019) 33 Cal.App.5th 694, 707, 245 Cal.Rptr.3d 435.) "Although it is unclear when California courts first began employing pretrial diversion, the first California statute authorizing such diversion was enacted in 1972." ( People v. Weatherill (1989) 215 Cal.App.3d 1569, 1575, 264 Cal.Rptr. 298.) Incidentally, of all the diversion statutes enacted in the past several decades, it appears section 1001.36 is the first to generate *567 controversy over the question of retroactivity.[2]
Section 1001.36 created a diversion program for defendants who suffer from medically recognized mental disorders, "including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder...." (§ 1001.36, subd. (b)(1)(A).) Enacted as part of Assembly Bill No. 1810 (2017-2018 Reg. Sess.) (Assembly Bill 1810), which was a budget trailer bill, the law took effect on June 27, 2018. (Stats. 2018, ch. 34, §§ 24, 37). Three months later, the statute was amended to prohibit its use in cases involving murder, voluntary manslaughter, rape and other sex crimes, the use of a weapon of mass destruction, and any offense "for which a person, if convicted, would be required to register pursuant to Section 290, except for a violation of Section 314[, i.e., indecent exposure]." (§ 1001.36, subd. (b)(2)(A)-(H); Stats. 2018, ch. 1005, § 1.)
*751 Subject to numerous caveats and restrictions, trial courts may now "grant pretrial diversion" when a mentally disordered individual is charged with a misdemeanor or felony offense (other than those previously mentioned). (§ 1001.36, subd. (a).) The defendant must first produce evidence of a mental disorder, which requires "a recent diagnosis by a qualified mental health expert." (Id. , subd. (b)(1)(A).) Among other requirements, the trial court must be "satisfied that the defendant's mental disorder was a significant factor in the commission of the charged offense," and a mental health expert must also conclude "the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (Id. , subd. (b)(1)(B), (C).)
The purpose of the new law "is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35.)
In this context, diversion is generally understood to mean "the suspension of criminal proceedings for a prescribed period of time with certain conditions." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 215 (2017-2018 Reg. Sess.) Jan. 9, 2018, p. 6; see People v. Ormiston (2003) 105 Cal.App.4th 676, 690, 129 Cal.Rptr.2d 567 [describing the legal effect of diversion in drug cases (§ 1000 et seq.) ].) However, when the Legislature uses the phrase "pretrial diversion" in a statute, the term is often precisely defined. (See, e.g., §§ 1001.1, 1001.70, subd. (b), 1001.80, subd. (k)(1).) As used in section 1001.36, pretrial diversion means "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment, subject to [additional restrictions.]" (Id. , subd. (c).)
If a defendant meets the eligibility requirements of section 1001.36, the trial court may order pretrial diversion into an approved treatment program for a maximum period of two years. (Id. , subd. (c)(1), *568 (3).) If the defendant commits additional crimes or otherwise performs unsatisfactorily in the diversion program, criminal proceedings may be reinstated. (Id. , subd. (d).) "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (Id. , subd. (e).) The statute further provides for expungement of *752 the "record of the arrest," with specified limitations. (See id. , subds. (e) ["if the court dismisses the charges, the arrest upon which the diversion was based shall be deemed never to have occurred"], (f)-(g).)
B. Applicable Law Re: Retroactivity
Case law instructs that "a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." ( Tapia v. Superior Court (1991) 53 Cal.3d 282, 287, 279 Cal.Rptr. 592, 807 P.2d 434.) Section 3 codifies an ostensibly stronger presumption: "No part of [the Penal Code] is retroactive, unless expressly so declared." However, in In re Estrada (1965) 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948 ( Estrada ), the California Supreme Court determined that an amendment to a particular criminal statute was intended to apply retroactively despite the Legislature's failure to expressly declare such an intent. The high court's rationale in reaching its conclusion has come to be known as the " Estrada rule."
The Estrada case involved a habeas corpus petitioner who had pleaded guilty to escape as defined in a former version of section 4530. ( Estrada , supra , 63 Cal.2d at p. 743, 48 Cal.Rptr. 172, 408 P.2d 948.) At the time of the offense, his crime "was punishable by at least a one-year period of imprisonment." ( Ibid. ) Subsequent to his capture but prior to his conviction and sentencing, the Penal Code was amended to reduce the applicable mandatory term of incarceration and to require no minimum period before parole consideration. ( Id. at pp. 743-744, 48 Cal.Rptr. 172, 408 P.2d 948.)
This is the holding of Estrada : "When the Legislature amends a statute so as to lessen the punishment [for a crime,] it has obviously expressly determined that its former penalty was too severe .... [Therefore,] [i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." ( Estrada , supra , 63 Cal.2d at p. 745, 48 Cal.Rptr. 172, 408 P.2d 948.)
The Estrada opinion also states, "[W]here the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." ( Estrada , supra , 63 Cal.2d at p. 748, 48 Cal.Rptr. 172, 408 P.2d 948.) The California Supreme Court has since clarified "that the absence of an express savings clause does not necessarily resolve the question whether a lawmaking body intended a statute reducing punishment to apply retrospectively." ( People v. DeHoyos (2018) 4 Cal.5th 594, 601, 229 Cal.Rptr.3d 687, 412 P.3d 368 ; accord, *753 People v. Conley (2016) 63 Cal.4th 646, 656, 203 Cal.Rptr.3d 622, 373 P.3d 435.) "The Estrada rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive *569 effect , 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible ....' " ( People v. Buycks (2018) 5 Cal.5th 857, 881, 236 Cal.Rptr.3d 84, 422 P.3d 531, italics added, quoting Conley , supra , at p. 657, 203 Cal.Rptr.3d 622, 373 P.3d 435.) Therefore, if the statute in question contains no express savings clause, reviewing courts "must look for any other indications of legislative intent." ( People v. Nasalga (1996) 12 Cal.4th 784, 794, 50 Cal.Rptr.2d 88, 910 P.2d 1380.)
In People v. Brown (2012) 54 Cal.4th 314, 142 Cal.Rptr.3d 824, 278 P.3d 1182, the high court emphasized "the limited role Estrada properly plays in our jurisprudence of prospective versus retrospective operation." ( Id. at p. 324, 142 Cal.Rptr.3d 824, 278 P.3d 1182.) It explained, " Estrada is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." ( Ibid. ) More recently, in People v. Superior Court (Lara ) (2018) 4 Cal.5th 299, 228 Cal.Rptr.3d 394, 410 P.3d 22 ( Lara ), "the same inference of retroactivity" was held to apply to a statutory amendment that "ameliorated the possible punishment for a class of persons[.]" ( Id. at p. 308, 228 Cal.Rptr.3d 394, 410 P.3d 22.)
The issue in Lara arose from the enactment of the Public Safety and Rehabilitation Act of 2016 (Proposition 57), which included amendments to Welfare and Institutions Code section 707. In particular, Proposition 57 eliminated a provision that gave district attorneys unilateral authority to prosecute juveniles as adults in courts of criminal jurisdiction for specified crimes. Under the amended statute, " '[c]ertain categories of minors ... can still be tried in criminal court, but only after a juvenile court judge conducts a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated. [Citation.]' "[3] ( Lara , supra , 4 Cal.5th at p. 305, 228 Cal.Rptr.3d 394, 410 P.3d 22, quoting People v. Vela (2017) 11 Cal.App.5th 68, 72, 218 Cal.Rptr.3d 1, review granted July 12, 2017, S242298, & cause transferred Feb. 28, 2018 ( Vela ).)
The question presented was "whether [the] requirement of a transfer hearing before a juvenile can be tried as an adult applie[d] to [the] defendant even though he had already been charged in adult court before Proposition 57 *754 took effect." ( Lara , supra , 4 Cal.5th at p. 306, 228 Cal.Rptr.3d 394, 410 P.3d 22.) The court noted Estrada was "not directly on point" because the change in law "did not ameliorate the punishment, or possible punishment, for a particular crime; rather, it ameliorated the possible punishment for a class of persons, namely juveniles." ( Lara , supra , at pp. 303, 308, 228 Cal.Rptr.3d 394, 410 P.3d 22.) Nevertheless, the same rationale was held applicable in light of " 'the possible ameliorating benefits of Proposition 57.' " ( Id. at p. 311, 228 Cal.Rptr.3d 394, 410 P.3d 22, quoting Vela , supra , 11 Cal.App.5th at p. 81, 218 Cal.Rptr.3d 1.) "The possibility of being treated as a juvenile in juvenile court-where rehabilitation is the goal-rather than being tried and sentenced as an adult can result in dramatically different *570 and more lenient treatment."[4] ( Lara , supra , at p. 303, 228 Cal.Rptr.3d 394, 410 P.3d 22.)
To summarize, Lara holds " Estrada 's inference of retroactivity" may arise outside the context of legislation that reduces the punishment for a particular crime. ( Lara , supra , 4 Cal.5th at p. 303, 228 Cal.Rptr.3d 394, 410 P.3d 22.) The Estrada rule is implicated "even if the new legislation merely 'ameliorate[s] the possible punishment for a class of persons.' " ( People v. Buycks , supra , 5 Cal.5th at p. 883, fn. 8, 236 Cal.Rptr.3d 84, 422 P.3d 531, citing & quoting Lara , supra , at p. 308, 228 Cal.Rptr.3d 394, 410 P.3d 22, italics omitted.) However, a statute's potentially ameliorative benefits are not alone dispositive of the issue. ( Lara , supra , at pp. 307-309 & fn. 5, 228 Cal.Rptr.3d 394, 410 P.3d 22.) Proposition 57 was held to apply retroactively because it "reduces the possible punishment for a class of persons," which permits the inference of retrospective operation, and because "nothing in Proposition 57's text or ballot materials rebuts this inference." ( Lara , supra , at pp. 303-304, 228 Cal.Rptr.3d 394, 410 P.3d 22.)
C. Analysis
In Frahs , Division Three of the Fourth District Court of Appeal observed that "for a defendant with a diagnosed mental disorder, it is unquestionably an 'ameliorating benefit' to have the opportunity for diversion-and ultimately a possible dismissal-under section 1001.36." ( Frahs , supra , 27 Cal.App.5th at p. 791, 238 Cal.Rptr.3d 483 (review granted).) We agree the statute confers a potentially ameliorative benefit to a specified class of persons. The question, however, is whether the class includes defendants who have already been found guilty of the crimes for which they were charged. We believe the answer lies in how the Legislature chose to define the benefit itself, i.e., pretrial diversion.
*755 As discussed, " 'pretrial diversion' means the postponement of prosecution , either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication ...." (§ 1001.36, subd. (c), italics added.) We agree with respondent's position that "adjudication," which is an undefined term, is shorthand for the adjudication of guilt or acquittal. (See Coalition of Concerned Communities, Inc. v. City of Los Angeles (2004) 34 Cal.4th 733, 737, 21 Cal.Rptr.3d 676, 101 P.3d 563 [statutory language is given its "plain and commonsense meaning ... in the context of the statutory framework as a whole"]; see also In re Harris (1989) 49 Cal.3d 131, 135, 260 Cal.Rptr. 288, 775 P.2d 1057 ["[T]here is 'no distinction between an adjudication of guilt based on a plea of guilt and that predicated on a trial on the merits.' "]; Black's Law Dict. (10th ed. 2014) p. 50, col. 1 [defining "adjudication"].) At most, "adjudication" could be synonymous with the rendition or pronouncement of judgment, which occurs at the time of sentencing. (§§ 1191, 1202; People v. Flores (1974) 12 Cal.3d 85, 93, fn. 6, 115 Cal.Rptr. 225, 524 P.2d 353 ; People v. Thomas (1959) 52 Cal.2d 521, 529, fn. 3, 342 P.2d 889.) Beyond that point, the trial court ordinarily *571 ceases to have jurisdiction over the matter. (See People v. Karaman (1992) 4 Cal.4th 335, 344, 14 Cal.Rptr.2d 801, 842 P.2d 100 ["Where the trial court relinquishes custody of a defendant, it also loses jurisdiction over that defendant."]; In re White (1969) 1 Cal.3d 207, 212, 81 Cal.Rptr. 780, 460 P.2d 980 ["When the trial court suspends imposition of sentence and grants probation, no judgment is entered until such time as the probation is revoked and the defendant is sentenced."].)
The Frahs opinion concedes the limits of the term "adjudication," recognizing the appellant had "technically been 'adjudicated' in the trial court." ( Frahs , supra , 27 Cal.App.5th at p. 791, 238 Cal.Rptr.3d 483 (review granted).) However, Frahs concludes this language is not probative of the Legislature's intent because "[t]he fact that mental health diversion is available only up until the time that a defendant's case is 'adjudicated' is simply how this particular diversion program is ordinarily designed to operate." ( Ibid. ) We do not agree with this reasoning. First, "[t]he purpose of those programs is precisely to avoid the necessity of a trial." ( Gresher v. Anderson (2005) 127 Cal.App.4th 88, 111, 25 Cal.Rptr.3d 408.) Second, the canons of statutory interpretation require scrutiny of the relevant text, "giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided." ( Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1386-1387, 241 Cal.Rptr. 67, 743 P.2d 1323.)
The other key definitional phrase is "the postponement of prosecution." (§ 1001.36, subd. (c).) As explained in People v. Tideman (1962) 57 Cal.2d 574, 21 Cal.Rptr. 207, 370 P.2d 1007, prosecution is synonymous *756 with "criminal action," and it means " '[t]he proceeding by which a party charged with a public offense is accused and brought to trial and punishment.' " ( Id. at p. 579, 21 Cal.Rptr. 207, 370 P.2d 1007, quoting § 683, italics omitted; see § 685 ["The party prosecuted in a criminal action is [known] as the defendant."].) A prosecution "commences when the indictment or information is filed in the superior court and normally continues until ... the accused is 'brought to trial and punishment' or is acquitted." ( Tideman , supra , at p. 579, 21 Cal.Rptr. 207, 370 P.2d 1007.) Accordingly, the case of People v. Chavez (2018) 4 Cal.5th 771, 231 Cal.Rptr.3d 634, 415 P.3d 707 notes trial is "the penultimate step in a criminal action," and the final step is "punishment." ( Id. at p. 785, 231 Cal.Rptr.3d 634, 415 P.3d 707, citing § 683.) Based on these principles, we conclude the prosecution phase ends with the rendition of judgment and sentencing.
Pursuant to the Legislature's own terminology, pretrial diversion is literally and functionally impossible once a defendant has been tried, found guilty, and sentenced. Upon reaching this point of "adjudication," the "prosecution" is over and there is nothing left to postpone. (§ 1001.36, subd. (c).) We see this as a clear indication the Legislature did not intend for section 1001.36 to be applied retroactively in cases such as this one.
The above considerations are disregarded in Frahs. Analogizing to the Proposition 57 paradigm, Frahs argues "the fact that a juvenile transfer hearing under Proposition 57 ordinarily occurs prior to the attachment of jeopardy, did not prevent the Supreme Court in Lara , [citation], from finding that such a hearing must be made available to all defendants whose convictions are not yet final on appeal." ( Frahs , supra , 27 Cal.App.5th at p. 791, 238 Cal.Rptr.3d 483 (review granted).) The argument alludes to *572 Welfare and Institutions Code section 707, subdivision (a)(1), which requires district attorneys to file a transfer motion in juvenile court "prior to the attachment of jeopardy" in order to prosecute a minor as an adult. However, Lara contains no discussion of this procedural requirement, save passing reference to its historical existence. ( Lara , supra , 4 Cal.5th at p. 305, 228 Cal.Rptr.3d 394, 410 P.3d 22.)
Relevant to Lara , the potential benefit of Proposition 57 was elimination of the direct filing procedure in former subdivision (d) of Welfare and Institutions Code section 707, and, by extension, the possibility of avoiding criminal punishment. The pending cases of defendants who had been prosecuted under the former law all began in criminal court, not juvenile court. "[U]nder Proposition 57, the juvenile is initially treated as a juvenile and can be treated as an adult only if and when a court transfers the matter to adult court." ( Lara , supra , 4 Cal.5th at p. 314, 228 Cal.Rptr.3d 394, 410 P.3d 22.) Retroactive application of Proposition 57 meant those defendants' cases would be sent to juvenile courts, and Lara cited with approval a remedial procedure allowing for the defendants' criminal convictions to be treated as juvenile adjudications. ( Lara , supra , at pp. 310, 313, 228 Cal.Rptr.3d 394, 410 P.3d 22.)
*757 This avoided any implication of the constitutional bar against double jeopardy, which is likely why there is no mention of it in Lara.
Furthermore, the timing requirement in Welfare and Institutions Code section 707, subdivision (a)(1), did not facially preclude retroactive application of Proposition 57. It only presented a theoretical obstacle for prosecutors in terms of getting cases previously filed under the old law transferred from juvenile court back into criminal court. ( People v. Cervantes (2017) 9 Cal.App.5th 569, 607, 215 Cal.Rptr.3d 174, review granted May 17, 2017, S241323, review dismissed, cause transferred Feb. 28, 2018 ( Cervantes ).) The appellate panel in Cervantes concluded "the voters would not have wanted a construction of Proposition 57 that would leave the district attorney hamstrung by a claim the motion was untimely" ( ibid. ), and the Lara court impliedly agreed. Under the remedial procedure described in Cervantes , defendants are understood to "implicitly waive[ ] any right to object to a transfer motion" in exchange for the potential benefits of Proposition 57. ( Cervantes , supra , at p. 609, 215 Cal.Rptr.3d 174.) The California Supreme Court referenced the Cervantes remedy with approval in Lara , supra , 4 Cal.5th at page 313, 228 Cal.Rptr.3d 394, 410 P.3d 22. Thus, upon close examination, we view the Frahs analogy to Proposition 57 as inapt.
Section 1001.36 does offer the possibility of avoiding a criminal record, but the Legislature used preadjudicative language to describe these benefits. If a defendant successfully completes the diversion program, the trial court "shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (Id. , subd. (e), italics added.) The remaining benefit is what we have referred to as expungement: "[I]f the court dismisses the charges, the arrest upon which the diversion was based shall be deemed never to have occurred, and the court shall order access to the record of the arrest restricted in accordance with Section 1001.9 [the expungement provisions of a separate misdemeanor diversion program], except as specified in subdivisions (g) and (h) [setting forth additional limitations]." (Ibid. , italics added.)
For defendants like Craine, retroactive application of the dismissal and expungement provisions of section 1001.36 would closely resemble a grant of felony probation under section 1203.4. The latter statute *573 offers the same type of benefits to defendants who have been adjudicated of a crime but later fulfill specified terms of probation. Upon a request following the defendant's successful completion of probation, "the trial court shall set aside the verdict of guilty ... and ... shall thereupon dismiss the accusations or information against the defendant and ... he or she shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted ...." (Id. , subd. (a)(1).) However, "[t]he limitations on this relief are numerous and substantial, including other *758 statutes declaring that an order under section 1203.4 is ineffectual to avoid specified consequences of a prior conviction." ( People v. Frawley (2000) 82 Cal.App.4th 784, 791, 98 Cal.Rptr.2d 555 [citing examples].) Notably, a dismissal and expungement do not affect the prohibition against owning a firearm and the requirement to register as a sex offender under section 290. (§§ 290.007, 1203.4, subd. (a)(2).)
Section 1001.36 does not contain the more extensive limitations on relief found in section 1203.4, which makes sense if the law applies only to nonadjudicated criminal charges. To construe section 1001.36 as having retroactive application would create a troubling loophole: defendants like Craine, who have been convicted, found ineligible or unsuitable for probation, and ordered to register as a sex offender for violating section 314, could obtain greater expungement benefits than are available to probationers convicted of the same offense. Such an occurrence might be relatively uncommon, but with regard to other limitations such as gun ownership, the disparate treatment would be widespread. Successful felony probationers are prohibited from owning or possessing firearms, but no such restriction would apply to mentally ill defendants whose convictions were expunged via retroactive application of the diversion statute. We do not believe this is what the Legislature intended in providing for pretrial diversion, and we find no indication otherwise.
The statute's textual indications are consistent with the available legislative history. Prior to the enactment of Assembly Bill 1810, the Legislature envisioned a "mental health diversion program with a focus on reducing the number of Incompetent to Stand [Trial] referrals to the Department of State Hospitals." (Assem. Floor, Bill Analysis of Assembly Bill 1810 as amended June 12, 2018 (June 18, 2018, item 17, p. 7).) Since an express or implied finding of competence to stand trial precedes trial, conviction, and sentencing, retroactive intent is a doubtful proposition.
The materials related to Senate Bill No. 215 (2017-2018 Reg. Sess.), which amended the original version of section 1001.36, are especially illuminating. According to the bill's author, the statute was designed to remedy problems associated with the inability of trial courts to "order mental health treatment, relevant counselling, or adherence to a medication regime unless the [defendant] was first convicted, and then placed on probation or sent to jail at county expense." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 215 as amended Aug. 23, 2018, p. 2.) The comments continue: "The predictable results of California's reliance on this outdated method are higher costs for taxpayers, who are forced to pay for the continuous warehousing of the mentally ill, when early, court-assisted interventions are far more likely to *759 lead to longer, cheaper, more stable solutions for the community, and for the person suffering from mental illness. [¶] ... By granting courts the ability to divert those suffering from mental illness into treatment at an early stage in the proceedings , [Assembly Bill] 1810 seeks to reduce recidivism rates for mentally ill defendants, and to avoid unnecessary and unproductive costs *574 of trial and incarceration. " (Id. at pp. 2-3, italics added.)
The quoted statements convince us that retroactive application of section 1001.36 is antithetical to the Legislature's goals. Early intervention cannot be achieved after a defendant is tried, convicted, and sentenced. The costs of trial and incarceration have already been incurred. Moreover, because mental health diversion is generally only available for less serious offenses, the reality is many defendants would already be eligible for parole or some other form of supervised release by the time their cases were remanded for further proceedings. Since mental health services are already available to parolees (see, e.g., § 3073), it is hard to imagine the Legislature intended for additional court resources and public funds to be expended on "pretrial diversion" assessments at such a late juncture.[5]
According to recent statistics, the median duration of a criminal appeal (statewide, from filing of the notice to filing of the opinion) is 463 days. (Judicial Council of Cal., 2018 Court Statistics Report, Statewide Caseload Trends, 2007-2008 Through 2016-2017, p. 51.) Ninety percent of criminal appeals are processed within an average of 834 days. (Ibid. ) Section 1001.36, in contrast, says "[t]he period during which criminal proceedings against the defendant may be diverted shall be no longer than two years." (Id. , subd. (c)(3).) Given the Legislature's apparent desire to have mental health diversion cases resolved in an expedient manner, there is little chance it expected the proceedings described in the statute to occur several years after the date of "adjudication."[6]
In conclusion, the legislative intent behind section 1001.36 is clear from the text of the statute and confirmed by the legislative history. "It would be *760 impertinent for this court to place a strained interpretation upon [the] statute merely to bring about a result which, in the enactment of that statute, was neither contemplated nor intended." ( People v. Borja (1980) 110 Cal.App.3d 378, 382, 167 Cal.Rptr. 813.) Pursuant to the foregoing analysis, we hold section 1001.36 does not apply retroactively to defendants whose cases have progressed beyond trial, adjudication of guilt, and sentencing. We express no opinion on questions of retroactivity under other circumstances.
DISPOSITION
The judgment is affirmed.
WE CONCUR:
LEVY, Acting P.J.
PEÑA, J.

The record contains a preprinted Faretta form, which Craine filled out and signed. The form is file stamped June 7, 2016, but it was purportedly executed on June 9, 2016. Craine's motion was orally made and ruled upon on the latter date.

See footnote *, ante .

The closest case we have found is People v. Perez (1998) 68 Cal.App.4th 346, 80 Cal.Rptr.2d 188, which held that a 1997 amendment to an existing drug diversion statute did not apply retroactively. (Id. at p. 349, 80 Cal.Rptr.2d 188.)

This is also known as a "fitness" hearing, as the judge must determine "the minor's fitness for treatment under the juvenile court law" as opposed to within the criminal justice system. (Manduley v. Superior Court (2002) 27 Cal.4th 537, 548, 117 Cal.Rptr.2d 168, 41 P.3d 3.)

Juveniles can only be charged as adults for certain crimes, most of which carry severe penalties. (See Welf. & Inst. Code, § 707, subds. (a), (b)(1)-(20).) Therefore, juvenile offenders who are prosecuted in criminal court typically face lengthy prison sentences. In contrast, the harshest punishment under juvenile court law is commitment to the Division of Juvenile Justice (DJJ), and a minor committed to DJJ " 'must generally be discharged no later than 23 years of age. ([Welf. & Inst. Code,] § 607, subd. (f).)' " (Lara, supra , 4 Cal.5th at pp. 306-307, 228 Cal.Rptr.3d 394, 410 P.3d 22, quoting Vela, supra , 11 Cal.App.5th at pp. 73-74.)

The facts of this case illustrate our point. Craine was sentenced on July 25, 2016, to an aggregate prison term of seven years, with presentence custody credits of 241 days. We do not know his exact circumstances at this point, but a similarly situated defendant who accrued half-time credits while serving his or her sentence would presumably be eligible for parole or postrelease community supervision before their case was resolved on appeal.

We also note the statute's requirement of a "recent diagnosis" by a qualified expert to aid in the determination of whether "the defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subds. (b)(1)(A), (B).) There is no reason to believe the Legislature intended to disregard the practical challenges of retroactively diagnosing a person's mental health. "Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." (Edwards, supra , 554 U.S. at p. 175, 128 S.Ct. 2379.)